The United States Court of Appeals for the Federal Circuit is now open and in session. Godspeed the United States and this Honorable Court. Good morning. The case for this morning is 171749, Munix Corporation v. Sanofi-Aventis. Ms. Ellison, whenever you're ready. Good morning. May it please the Court, No matter which standard this Court uses, it should construe the term human and the technical term human antibody to mean fully human and not encompass antibodies that are only partially human and partially non-human. Because the 487 patent has expired, this Court should apply the Phillips standard and just like the District Court at Appendix 9036, find that the term human means fully human. But even if this Court were to determine somehow that the broadest reasonable interpretation should apply, the Court should reach the same construction because the Board committed at least three legal errors. First, Ms. Ellison, I'm sorry, Ms. Ellison, let me just interrupt you for what I think is a preliminary matter which is one you referenced which is the correct standard that would be applicable here given the terminal disclaimer. My understanding is your position is that on appeal, and this is what you say in your 28J letter, that on appeal we should review the Board's determination under the Phillips standard. You're not suggesting in any way, shape, or form that even if you're right about the changing standard, that that would require remanding this to the Board to reevaluate. So am I understanding correctly that you're talking about the standard we would use on review, not a matter of asking us to send this back to the Board, right? That's correct. We submit that this Court should apply the Phillips standard and to conduct a novo claim construction, not remand it to the Board on the claim construction issue. Okay, thank you. I'm sorry to interrupt. Please proceed with your claim construction argument. So the Board committed at least three legal errors. First, it dismissed the claim amendment that surrendered partially human antibodies. Second, it misread the specification which uses the term human only to refer to fully human antibodies. And third, it reviewed the evidence from its own perspective without ever determining how a person of skill in the art would understand the term, and the Board therefore failed to set an objective baseline from which to begin claim interpretation as required by Phillips. Can I just ask, this is just Toronto, you said in your blue brief, and then I thought quite correctly walked it back in your gray brief, but now you're back I think to your blue brief position, that the necessary doctrinal starting point is a determination of what the ordinary meaning would be. I thought one of the things that Phillips did was to set that kind of sequencing requirement aside, and in particular in talking about ordinary meaning, in the very sentence after the one that you quote about a kind of starting point, the next paragraph begins with, and indeed the next sentence, notably a skilled artisan would make that determination in the context of the particular patent, and so we are back to our normal rule that intrinsic evidence counts more than extrinsic evidence. We don't disagree with the concept that intrinsic evidence may count more than extrinsic evidence, but the ultimate issue is what weight should the Board give to all the evidence, and it should consider all the evidence, and cases such as the Pitney Bowes case make it very clear that, as the court said, it's entirely appropriate, perhaps even preferable for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed plainly apposite and widely held understandings in the pertinent technical field. I guess I had understood what the Board did was as follows, that there is some material in the specification, principally column 19, a little bit top of column 21, that is very strongly suggestive, maybe even more than that, but at least very strongly suggestive, that the specification is using human to cover both partially and wholly, and in the face of that, at least the broadest reasonable interpretation would be that, unless there is something quite clear to the contrary, and neither the prosecution history nor the extrinsic evidence is clear. The prosecution history, for reasons we can discuss, but while we're on the subject of the extrinsic evidence, that the Board did look at the extrinsic evidence and said, with Reichman and some of the other material, it's just not that clear. With respect to the extrinsic evidence, the Board brushed aside the extrinsic evidence by saying it was not inconsistent with the specification. But what the Board should have asked was whether that extrinsic evidence was inconsistent with the claim construction that the Board was leaning towards. Furthermore, I think the case law makes it clear that the patents are written for persons who have ordinary skill in the art, and it is through the lens of a person of ordinary skill in the art that the patents, both the intrinsic evidence and then the extrinsic evidence as well, should be understood. Here, with respect to the extrinsic evidence, all the evidence from the relevant time period, 18 references that Immunex submitted, as well as expert testimony, and even Sanofi's third party witness, all make it clear that the term human would be understood to refer only to fully human antibodies. In contrast, the Board relied upon the Reichman reference, which used outdated nomenclature that had been published 13 years earlier, before terminology such as humanized had even been developed. With respect to the prosecution history, the Board improperly dismissed the amendment on the ground that there was no express disclaimer or disavowal, but cases such as the DiAgostino v. MasterCard case and the Shire v. Watson case make it clear that an express disclaimer or disavowal is not required for the prosecution history to inform the meaning of a term. In cases such as Festo and this court's UCB Vieta case, state plainly that the general rule is that a patent applicant cannot later obtain scope that was requested during prosecution, rejected by the examiner, and then withdrawn by the applicant. And that's what happened here. When Immunex amended Claim 11 to delete reference to partially human antibodies, chimeric antibodies, and humanized antibodies, Immunex surrendered that claim scope, yet the Board was wrong for dismissing that claim amendment. One of the errors that the Board made in dismissing the amendment was assuming that the claims must cover all disclosed embodiments, but it's well known that a patent application can disclose embodiments without claiming them. In cases such as the SRI v. Matsushita case make it clear that the fact that the claims are interpreted and invited to specifications doesn't mean that everything expressed in the specification must be read into the claim. Counsel, this is Judge O'Grady. Let's go back to the prosecution and the amendment during the prosecution. It seems to me that what the Board found with respect to the amendment was that there was nothing to indicate that the amendment was intended to limit the claims to fully human antibodies. What's your view as to the intent here? Is this the Board's intent or is it applying the person skilled in the art? What's the exact basis that the Board based its decision not to consider the amendment? The Board based its decision to brush aside the amendment based upon a misunderstanding and a false assumption that there was overlap between the term human and partially human just because there's an overlap between partially human, chimeric, and humanized antibodies. But there's no evidence that supports the Board's leap in logic. As Eminex explained, in the therapeutic antibody field, as that field developed, it developed specific nomenclature to distinguish the various categories of antibodies. Because human antibodies, in other words, fully human antibodies, have different structures and cause fewer harmful immune reactions, as we show in Appendix 7045, those human antibodies were understood by persons of skill in the art to be distinct from non-human antibodies or only partially human antibodies such as chimeric and humanized antibodies. Well, am I correct in my reading that the Board says that it found nothing to indicate that the amendment was intended to limit? It recognizes the limitation, but apparently the Board said that there was no intent to limit the claims to fully human antibodies. If you're reading from the Board's decision, I will accept that you're reading it correctly, but the Board was incorrect in its assessment of that intrinsic evidence. For example, the Board made some arguments that at Appendix 10-11, pressing aside the amendment on the ground that the amendment was made in response to an inherent anticipation rejection to distinguish human antibodies from art-directed mammalian antibodies. But cases such as the Norian Corporation v. Stryker case make it clear that the surrender extends to what an applicant actually gave up, not just to what it had to give up to overcome the rejection. Thank you. I believe I'm at time, if I'm not mistaken. Yes. Why don't we hear from the other side? Thank you very much. Good morning, and may it please the Court. Lauren Fornerato for Cross Appellant Sanofi and Regeneron. After carefully considering the record, the Board correctly concluded that the term human antibody includes partially human antibodies and is not limited to fully human antibodies. I'd like to walk through the relevant portions of the intrinsic record to show you why the Board's analysis at Appendix 7-14 was right. This is Judge Toronto. Can I ask you about one thing? Why was Claim 11 dropped during prosecution history? Sure, Judge Toronto. I think in your brief you say, well, it was now redundant. Maybe that's the best you can do, but is there anything more? We do believe it was redundant. As the Board found, the various classes of antibodies in Claim 11 overlap. Indeed, even Immunex admits to overlap between three of the four classes. These are not mutually exclusive, and it was reasonable for the Board to conclude that the fourth class, human, also overlaps with all of the rest. Let me see if I can just say this a slightly different way. Maybe a certain kind of punctiliousness would lead the patent applicant to say, oh, I look at Claim 11, I don't need it anymore, I'll get rid of it. Patent applicants typically, I would think, keep redundant claims, because why not? It's harmless. What is the affirmative reason in your view that not only was human added to Claim 1, but Claim 11 was actually canceled? It is the redundancy, but I think importantly here, we don't think this rises to the level of a clear and unambiguous disclaimer. At best, we think the Claim 11 cancellation is ambiguous, but what we think clarifies the ambiguity is the very next office action, found at Appendix 2211, where the examiner stated that even after Claim 1's amendment and Claim 11's cancellation, these claims continue to include humanized antibodies, and humanized antibodies are partially human antibodies. We also think that the rationale for the Claim 1 amendment also supports the board's construction here. It's important to note that the only scope that the Immunex gave up here was non-human antibodies. Right, because Moseley talked about human or murine ones, and they needed to write around Moseley. I guess I'm really trying to figure out if human by itself and even the specification passages are something less than clear and therefore would benefit from such illumination as the prosecution history would supply, short of disclaimer, why doesn't the otherwise unorthodox withdrawal or cancellation of Claim 11 supply an important clue? Your Honor, I'd like to direct your attention to the 702 application, which is reproduced in our red brief at 52. That application shares the same exact specification as the 487 patent. It came immediately before the 487 patent. The same person of ordinary skill in the art would be implicated. That application has the exact same Claim 11 that was canceled in the 487 patent. If you look at Claim 1 compared to Claim 11, Claim 1 refers to a fully human control antibody, and then Claim 11 refers to a human isolated antibody. We think that these two claims together show, consistent with the specification and the rest of the record, that fully human and human mean different things. Human is broader. This court in In re Moris explained that the burden of precise claim drafting is on the applicant. Here, had Immunex actually wanted to limit its claims to fully human, it knew exactly how to do so. But we submit the reason it did not is because, as Immunex admits, fully human antibodies were relatively new technology as of 2001. That, in part, is why human is a broader category. It doesn't mean non-human. It means partially or fully human. I can show you the portions in the specification that I believe make this clear. The board relied on Column 19, Lines 41 through 44. This is not the only area of the specification that the board relied on. There were at least four other passages. But we do think that these are important. At Appendix 76, these passages read, Procedures have been developed for generating human antibodies in non-human animals. The antibodies may be Can you give us a column and line? You said Column 19. What line are you reading from? Oh, sure, Chief Judge Prost. It's Lines 41 through 44. So Appendix 76, Column 19, 41 through 44. Okay. And it states, Procedures have been developed for generating human antibodies in non-human animals. The antibodies may be partially human or preferably completely human. Right. Just to be clear, if I remember right, maybe you can correct me, but it's rather a big part of Immunex's answer to that, that you started one sentence too late. Well, yes, that is their argument. But respectfully, we believe that they're ignoring. They read the antibodies as modifying another sentence that I didn't read to you that comes before. But we think Immunex's reading ignores the second sentence. And I can point you to another area of the specification that supports the board's interpretation here, that the antibodies that may be partially human modifies human. And so if I can direct your attention to Appendix 77, Column 21, Lines 6 through 13. It states, Examples of antibodies produced by immunizing such transgenic mice are human monoclonal antibodies designated 6-2, 12B5, and four others. In the very next sentence, it states, Monoclonal antibodies 6-2, 12B5, and the four others are fully human antibodies. So there would be no need for this clarification if, as Immunex argues, human was interchangeable with fully human. In fact, you wouldn't even need the term fully human at all in this specification or in this field of art. And Immunex has provided no real response to this finding by the board, either today or in briefing. And we believe this portion of the specification, cited in the board's opinion at Appendix 9, disproves Immunex's argument that the term fully human is only used in the term partially human. And Immunex's argument there was based on the district court's finding that also did not cite this area of the specification and is one of the main reasons why we believe the district court's construction is wrong. And I think that brings me to one of the preliminary questions Chief Judge Prost asked, which is what's the standard here? And we believe the standard here is BRI. So Immunex waived any argument that BRI should not apply by not raising it at the board or in its opening brief in this appeal. Instead, Immunex waited until two and a half years after this case began to file this terminal disclaimer, all to effect a standard change. And we don't think such attempts at a do-over should be countenanced, especially when there's no apparent reason for Immunex filing this. The district court case has been staged since February of 2019, and we saw nothing in the prosecution of this application or any related applications that prompted this. And in addition to waiver — This is just trying to — can I just ask you this question? Do you know the answer to the question whether if Immunex during the IPR, let's say even early in the IPR, had filed a terminal disclaimer, whether at that point the board would have said, okay, now it's just like an expiration while the matter is before us under our regulation, and we would then apply Philips and not BRI? Well, Your Honor, I think the 37 CFR 42.100B that was applicable in this proceeding may answer your question. And it provides that a party may request a district court-type claim construction. So Immunex could have filed this terminal disclaimer earlier and requested that the board apply Philips. But it deprived the board of that chance, and it deprived the parties of briefing. I don't have the language in front of me. But let me stipulate that Immunex could have requested it. Do you know what — do we have any idea what the answer from the board would have been? No, that is not a good enough reason. Your voluntary action of terminally disclaiming is not a good enough reason, or yes, it is a good enough reason, and therefore we're going to proceed under Philips. The reason I guess I ask is that if it were clear that the board would have said no anyway, and then it feels a little funny to say Immunex waived the opportunity because there really wasn't an opportunity. Maybe, therefore, you would need a different ground from waiver. Well, so the different ground from waiver is that the terminal disclaimer, this court's predecessor has held in Inree Heil and Inree Thorington, that the terminal disclaimer is not part of the record and need not be considered by this court if it was not filed before the board's decision. So I think that that is another independent ground. Okay. I'm recalling that there is a board decision in which a different case, where they rejected the terminal disclaimer before it, saying that there was gamesmanship. Is that familiar to you? I don't have the case in front of me. Your Honor, I'm not familiar with this case, but I think that the board probably could have rejected it, but I think what's important is the parties would have had an opportunity to address it before the board and address it before this court, the impact of the terminal disclaimer. And Immunex's, you know, belated attempts here, deprive the parties of that option. What if they had filed this the day before yesterday, the day before this argument, we just think that this sort of attempt should not be countenanced. Okay. Your Honor. Did you hear the bill? I did. I was going to say, if I may turn to the cross appeal, if there are no more questions in the direct appeal. Sure. But you're running into your rebuttal time. So that's fine. Thank you, Your Honor. So on the cross appeal. So the cross appeal need only be addressed if the direct appeal is, is remanded. And in the cross appeal, we believe that the board's legal error was applying the wrong test for determining whether the one three, two publication was by another under one Oh two E the board improperly focused on who invented the challenge claims of the four, eight seven patent. Rather than who invented the anticipatory six, two antibodies disclosed in the one three, two publication. And we believe that legal error requires remand. And unless there are any questions, I'll reserve the remainder of my time for rebuttal. Okay. Thank you, Ms. Lynch. You've got two minutes. May it please the court. Because immune access terminal disclaimer is not part of the record on appeal. This court shouldn't give it any effect. And as Ms. Fornerato mentioned, the CCPA has done that in two cases in Thornton and Heil. In both cases, they said that because the terminal disclaimer was filed after the board decision, they were going to decide as if it had never been filed. And we think this court should do the same here. Can I ask you that? Oh, I'm sorry. Go ahead. Go ahead. Go ahead. Yeah. I'm curious about this. I think that for Apple, which sites Facebook and Microsoft and fish that all three of those cases together involved situations where I guess in Apple, actually, there was no dispute about the application of the claim construction. And then the other two, both opinions expressly say the Phillips rule makes no difference whatsoever. But, but here we are with at least a statement in one presidential opinion, Apple saying that when something, when the patent expires on appeal, Phillips governs and not BRI. How does it, maybe that's correct. Maybe that's incorrect. And maybe that's, that's your view, but how does that square with the principle that you said you decided that the terminal disclaimer was not part of the record in the district court is the expiration date. Part of the record is that somehow make a difference? Well, I guess it's different in Apple versus Andrea. The patent expired of its own accord, right? So the parties knew about it. They were able to brief it. Both parties agreed. The claim construction would be the same. And none of those circumstances happened here. I mean, I had to, had to file the terminal disclaimer to force the expiration of the patent. I'm sorry. I'm out of time. What? No, continue your answer. If you want to more fully respond to which Toronto, yes. And also I'd like to say, I think there's a little, there's Apple versus Andrea, but the cell gene case is also precedential. And in that case, the patent expired of its own accord. And this court went ahead and reviewed the board's BRI claim construction. And in that case, cell gene did not brief it in its briefs the same way. I mean, next did here. And so we think this court as a reviewing court should be reviewing the board's BRI analysis as it didn't sell gene. Okay. Thank you. Returning to Miss Ellison for your rebuttal time. Thank you, Your Honor. This court has uniformly applied Phillips instead of the BRI. If a patent has expired while a case is on appeal and nothing in that case law suggests that this rule turns on the reason for the expiration. The reason for applying Phillips is because the patentee can no longer amend the patent claims. In this case, if there was no gamesmanship, Immunex filed a terminal disclaimer in response to an obviousness type double patenting challenge that Sanofi brought in district court. And of course, the patentee doesn't follow a terminal disclaimer lightly, but Immunex did so here and risk giving up damages in order to get that terminal disclaimer on file in time before expiration of the 450 patent. Okay. Can I ask you this? I mean, since this is rebuttal on the cross appeal, what is your answer on the cross appeal? And don't bother with the distinction between whether the board incorrectly, I guess twice said something about co-inventorship of the 487 as opposed to co-inventorship, at least co-inventorship of the antibody 6-2. Why wasn't the board incorrect in its view about Boyani not being a co-inventor of the 6-2 under the standard of Amgen for developing and recognizing the claimed properties of a new compound? So this board possibly determined that Mr. Boyani, who was a laboratory technician working for the 487 inventors did not make an intellectual contribution necessary for conception. And as the board properly recognized, this case is distinguishable from the Amgen B2Guy case where there was a lot of unpredictability in the field in that case and the particular patent claims there required knowing the DNA or amino acid sequence of the molecule that was at issue there, which could only be determined by sequencing. Here, all the intellectual contribution indisputably came from the 487 inventors. And even as Mr. Boyani acknowledged, he was simply a pair of hands for the inventor's thoughts. He did not contribute to conception of the antibody 6-2. His concession on the point can't possibly be controlling given who he works for, right? His concession is unrebutted evidence in this matter that's fully consistent with the other evidence. In response to Sanofi's allegation, Inunix submitted, as is common in response to these types of allegations, Inunix submitted declarations from all three inventors, which were corroborated by testimony from two laboratory technicians, as well as contemporaneous meeting minutes, as well as a disclaimer declaration from Mr. Plineke, whom Sanofi initially alleged was the inventor of the antibody 6-2. There's not a shred of evidence in the record to suggest that Mr. Boyani made an intellectual contribution to the conception of antibody 6-2 or any other antibody. He was simply a pair of hands working at the direction and behest of the 487 inventors. Okay. Thank you. So here, Sanofi's arguments fail because the board conducted exactly the analysis that the law requires, including all the analyses that the Duncan parking case requires. Sanofi simply quibbles with the board's factual determination, but tries to present it under the guise of a legal error. Turning back to the 2017-1884 IPR, I will note that it's undisputed here that Inunix did not act as its own lexicographer. And so the plain and ordinary meaning of the term human should be applied here. Inunix's use of the term fully human along with the term human are simply synonyms for the same concept in the art. We think the district court was correct in noting that without further context, you don't have to specify that something is fully human or full lemonade, as the district court called it in one example, to expect to receive a full lemonade and not an Arnold Palmer. So Sanofi's allegation that the term human somehow covers something that's only part human is simply un- Take another minute. You can take another minute to finish your thought. Thank you. As we explained in our brief, Inunix used the word fully human simply to provide linguistic emphasis and to juxtapose the fully human antibodies versus antibodies that were only partially human. The language that Sanofi and the board have focused on in column 19 of appendix 76 simply does not arise to the level of the definition. And Sanofi and the board essentially have to read the word human into the last sentence of that passage. Doing so would be improper. And so with that, I thank you for your time, unless there are any further questions. Thank you. Thank you. Ms. Bales, does Ms. Fornato have some time left on her cross-appeal? 30 seconds. Two minutes. Okay. Why don't we all give you another minute if you want to respond to just the cross-appeal question on 102E. Yes, thank you, Your Honor. So on the question of Amgen, the sole basis on which the board distinguished the Amgen case was that Amgen was based on an unknown DNA sequence, while the 6-2 antibody was made based on a known DNA sequence. But that's an undisputed factual error, because the known sequence that the board relied on, the known sequence for 12B5, that was actually not known until after Mr. Boiani made the 6-2 antibody. And as for his intellectual contribution, it's undisputed that he is the only person who created the hundreds of thousands of antibodies from which he personally selected the 6-2 antibody as the best of the bunch. And he presented his discovery to the 487 patent inventors, not the other way around. And they even in the record at Appendix 18,023 through 25, they recognized this as his antibody. Thank you, Your Honor. Thank you. We thank all parties and the cases submitted.